My name is James Hollahan. I represent the appellant, Liberty Life Assurance Company of Boston. With the court's permission, I'd like to reserve three minutes of my time for rebuttal. This is an appeal from a final judgment in an ERISA case entered by the court in October of 2013, which reversed Liberty Life's administrative determination and awarded Ms. James disability benefits under a group disability policy issued by Liberty Life to her former employer. The court awarded retroactive benefits for the two-year period in which the own occupation definition of disability was applicable. It's a somewhat unique case because the plaintiff here was admittedly suffering. She had been in a motor vehicle accident in October of 2000. That's a serious one. How big was this truck? Are we talking F-150 or 18-wheeler? I'm not sure what kind of vehicle it was. It was a rear-end collision, according to the police report. Forty-five miles an hour. That's a heck of an accident. It seems to be the case, although she was not hospitalized. She was taken to the hospital and was treated, but was not hospitalized, but clearly did sustain both physical injuries, and also there was evidence submitted during the administrative review process that she was suffering from psychiatric problems or depression and anxiety, distress, and things like that. The thing that makes the case unique, the district court reversed Liberty Life's determination finding that standing alone, neither her physical injuries or problems, nor her mental problems, rendered her disabled, but that the combination of those problems rendered her disabled. That's entirely permissible, though, right? It doesn't have to be just physical or just psychological. Well, Your Honor, it certainly is permissible, but the problem, and I think the thing that makes this case somewhat unique, is that we were getting conflicting information. Usually these cases, I'm sure this court sees a lot of them. I think I had one yesterday. And it usually comes down to you've got the treating physician saying one thing, you've got either independent medical examinations or reviewing physicians saying another, and the decision generally involves a resolution of that conflicting medical testimony. We have a de novo standard of review here, contrary to what we usually have in this. You do, Your Honor. Both the district court and this court exercise de novo review. And the reason for that, even though the policy contained a discretionary language that usually triggers the more deferential, arbitrary, and capricious standard, this policy was issued in Michigan and is governed by some Michigan insurance rules that were promulgated back in 2007 that eventually renders discretionary review prohibited. And so in the district court, the parties agreed, based on the applicability of those rules, that the district court had de novo review, so therefore no deference is afforded to the administrative determination. I know you're not making that argument here, but, I mean, I will say it's just odd that Michigan law could have the effect of dictating our standard of review in federal court for an ERISA claim. And that might be something that would be interesting to have somebody argue about at some point. But it's not in this case. Actually, Your Honor, it was argued, and at least a panel of this court rejected the idea that that Michigan rule was preempted by ERISA on the theory that the insurance regulations are laws regulating insurance and, therefore, they're within what's called the saving provision of Section 514 of ERISA. I tend to agree with you, but I'm not exactly an objective voice on that issue by my own admission. But the point is that neither the administrative decision is entitled to deference and Judge Jonker's decision is likewise not entitled to deference. You're basically sitting in the same position he was in reviewing the evidence based upon a preponderance of the evidence standard. And here, the thing that I think makes this case different is what happened during the administrative review, we were getting conflicting information from the various treating physicians. Dr. Nabitti, who was Ms. James' treating pain and rehabilitation specialist, submitted information and eventually had a conversation with one of the reviewing physicians where he said that from a physical standpoint, Ms. James was capable of returning to work in at least a sedentary occupation, but that she couldn't do so because of her mental problems. And Dr. Fulland actually sent a letter to Dr. Nabitti asking him to confirm that, and he signed that letter confirming that was his view. That was in February of 2012, about a couple weeks before the decision was initially denied. In addition, Dr. Mazera, the treating psychiatrist, submitted forms where she was asked to fill out forms saying do you find the person disabled, and there was a section of these forms. She sent one in in December of 2011, another in January of 2012. She listed the reason for disability as physical pain caused from motor vehicle accident, and she listed the mental problems, the anxiety and depression, as a non-disabling comorbidity. So you have the mental specialist saying the problem is physical, and the physical specialist says the problem is mental. Correct. And so what does Liberty do at that juncture? It sends the records out for review by both a mental health psychiatrist and a pain and management specialist. They do a joint report that's acquired through a vendor that has them, you know, Liberty requested the specialties, the vendor selects the physicians, and the report comes back from those two physicians saying we don't see anything in the record supporting a physical disability. Did these two examine her? They did not, Your Honor. They did have a couple that did. There were, in the beginning, not at the request of Liberty. This was during the short-term disability plan administration, which is a self-insured plan. DTE requested an independent medical examination both by a pain specialist and a psychiatrist. The pain specialist, that report is in the record. It was October of 2011, and he said that he didn't see anything in his physical examination or the records that would prevent her from returning to her own occupation. The psychiatrist had an initial report where he made a similar conclusion. Then what happened is she actually went back to work for a period of time, was having difficulties, and went out again. And he then did another examination during which he administered what was called a Beck inventory, which other reviewing physicians later refer to that as a self-report. And based on that, he found that because of her mental condition, she should not go back to work, and that's probably why she received the short-term disability benefits from her employer before the long-term claim kicked in. This was a which one, Dr. Foreman that made this? Dr. Foreman, yes, that's exactly right, Your Honor. He first said she could return to work and then gave her this Beck test and said she could. Correct. And the later reviewing physicians during the Liberty Life administrative process looked at that opinion, but their views were the Beck test that was administered was essentially a subjective self-report and would not really provide what they called objective clinical evidence of a mental disability. I mean, on the other hand, surely Dr. Foreman is aware of that. He's aware of the self-reporting nature, and yet I guess looking at his examination and understanding of her as a whole, he still says she's disabled. He did say that. And then, of course, the other objective test that was done on the mental side of it was in June and July of 2012 at the request of Dr. Nabitti. Ms. James was referred for a neuropsychological battery of testing because Dr. Nabitti was saying at that time she could perform notwithstanding her physical condition, but these cognitive issues were preventing her from returning to work. And when you look at the results of that neuropsychological test, they don't corroborate the self-reports of cognitive dysfunction and memory problems, which Dr. Foreman had found as a result of his Beck inventory. For example, at page 291 of the record, relative to level of education estimated premorbid level of functioning, her overall cognitive functioning was generally well preserved. Later on the same page, her performance on tasks of learning and memory were average, contrary to her self-report of memory problems. So at this point, June, July of 2012, based upon an objective battery of neuropsychological testing, which I would submit is more comprehensive than the Beck inventory that Dr. Foreman administered, her self-reports of cognitive dysfunction and memory problems are not corroborated. I mean, it's a tough case because there's, as you're very candidly pointing out, there are a lot of things on each side. What is the biggest mistake that you think Judge Yonker made? I think the biggest mistake is he actually criticized the reviewing physicians for not doing something that they really aren't qualified to do. What he credited the treating physicians, and I think he said they had a more nuanced opinion because they took into account both the physical and the mental. When you think about it, Dr. Nabitti is a pain and pain management specialist. He's not qualified to say that Ms. James is suffering from post-traumatic stress disorder, and yet that's exactly what he says in his records. Dr. Mazzaro, on the other hand, by her own admission, said she wasn't the one putting her out for work. It was the physical condition, and the mental condition is non-disabling comorbidity. What else can Liberty do but send the records out? Unless you could find some doctor that has a specialty in both psychiatry and orthopedic surgery or something. You've got to do what Liberty does, which is you send it out for a dual review by what the Department of Labor requires us to do, specialists with appropriate training, and you get those opinions and you read them. I fully understand your answer. Thank you, Your Honor. All right. You'll have your rebuttal here from Mr. Haney. Thank you, Your Honors. Troy Haney from Michigan, and I appreciate the opportunity to present our case here today. I guess what I'd like to do is jump right into a couple of issues that I just heard discussed, and I may only use seven and a half minutes, but we'll let the record reflect. I'm entitled to the full 15. Okay. No, I think in terms of what Judge Yonker was trying to say when he was evaluating the treating physicians and comparing them to the record reviewers is not quite as black and white as what Liberty might represent, and that is what Judge Yonker did was he went through the Hoover-Calvert-Kalish analysis in the wake of Nord v. Black and Decker, and he compared the quality of the medical evidence that we have in this record, and keeping in mind this is a medical record that is pretty short in time from an auto accident until you're cut off from submitting records. The next round, if this Court affirms, will allow us an additional two years of medical records with a woman who has underlying rheumatoid arthritis and longstanding insulin-dependent diabetes, which complicates the healing process and her ability to cover from the neck injury and the shoulder injury and the pain that she experiences from those injuries, the records will obviously have evolved. So what Judge Yonker was doing is evaluating the limited records that he has and comparing the quality of the evidence provided and the quality of the opinions provided. And he puts a lot of weight on whether a doctor did an in-person examination or not. I understand that. The law permits that. Especially as to the psychiatric issues. Okay. Let me share with you the concern I have. I mean, there are arguments to be made on both sides. I think an argument to be made against your position is that, yes, both of the treaters say she's disabled, but as we discussed earlier, the psychologist says she's not disabled mentally, she's disabled physically. So that person goes outside of their specialty to say, the problem's not in my area, it's in the other area. And the physical, the orthopedic, does the same thing. She's not physically disabled, but I think she's got a mental or a psychological disability. And then so that would seem to be on its face, arguably, a reason to discount those treater opinions because they're kind of getting outside their lane in each instance. And then one could argue, as Mr. Hollahan just did, that the district court takes that potential deficiency and actually treats it as an asset, as a virtue that they took this holistic approach. And, I mean, isn't that a mistake by the district court, arguably, to say they're more credible because they're opining outside of their specialty? Well, no, not in this case. Especially because I think Dr. Nabitti ultimately does talk more in terms of the physical condition in the final letter that was submitted and the physical disabilities in preventing her. You touched on a very significant point, and that is what the policy allows Liberty to do is to not just look at what Ashima James did in her job as a buyer for DTE, but also to look at the national economy and how that position would typically be performed. And it's not actually a sedentary position. It's a sedentary and light position. And there isn't anybody on Liberty's team of experts that says she can perform at a light capacity, but only potentially at a sedentary capacity. So that's number one. Two, in terms of getting into what her actual functional capacity is, I would argue that a pain management doctor who sees longstanding chronic pain issues on a daily basis is qualified to talk about not only the physical aspects of the pain, but also how that pain manifests in the average person. I have the unfortunate obligation to say that I've been doing this for over 20 years now, and I don't think I've ever had an ERISA case with chronic pain where someone doesn't have depression and anxiety, and these symptoms become very serious in dealing with that. And if we're going to say that pain management specialists are only going to address epidural injections and inflammation and things of that nature, I think that that cuts very short in terms of what they actually do in the clinical setting. They treat the entire person. And typically a pain management doctor gets somebody who is not a candidate for surgery, who is not a candidate for other types of pain relief, and it's sort of like a last stop. And that's why Dr. Nabitti is in a perfect position to give opinions about the overall well-being of Ashima James and her ability to return to her job, which isn't just a light job. Although she did do a lot of desk and computer work, she was required to travel to plants and do plant evaluations at DTE, and that automatically puts her into the light side of the job description. So there really isn't any evidence that says that she can do the job as it's performed in the national economy or as she was doing it. And I think Dr. Nabitti is in the best position. And what Judge Yonker, under the de novo standard, is doing is weighing the quality of the medical evidence and deciding, and I think rightly so, that the treaters are more nuanced in their opinions. And your very first comment to Counsel for Liberty, I think, is probably the most salient comment that I could make right now, and that is it doesn't matter because if this is a comorbid situation, which it surely is, it doesn't make any difference for the first 24 months. If she's disabled from her own occupation, then she's disabled. Now, at 24 months, they can employ the 24-month mental and nervous limitation if it applies. I don't think it will, but if it does. Or if she can return to other occupations, potentially, as long as they don't pay less than what she was earning at the time, they will then have those arguments. But they don't have them now. They don't have them for this case. And that's not even before the court. What's your biggest criticism of the file reviewer's assessment? I don't have enough time to address it, but I'll just jump to one of my favorites. Dr. Shlomo Mandel, how in the world can he put in writing that she has no objective verification of these subjective complaints when this poor woman's got MRIs of her shoulder and back and the MRI of the cervical spine shows gross effacement of the spinal canal? How is that not objective evidence to verify her subjective complaints? That's stenosis you're talking about? No, it's more than stenosis. Stenosis is just simply a narrowing of the spinal canal. Effacement is pressure on the spinal canal that is seen in addition to the stenosis. And a woman who already has rheumatoid arthritis and these other conditions, and now she's dealing with that, how is that not verification? As if objective evidence was even required, because it's surely not. She had the RA at the time of the accident, or that's manifested post-accident? Oh, I guess I'm not sure I understand your question. Well, when did the rheumatoid arthritis become evident? The quote-unquote objective testing of it that I'm aware of that's in the record was after the accident. First time? First time that I'm aware that it was tested for, but that's most certainly not when it began. I mean, that's not a condition that starts overnight or traumatically. She would have had it for years. But with the accident and all the problems she was having post-accident, that's when they start running some of these things to earth to try to cope with. And she gets referred for the first time to a rheumatologist who does the blood work that confirms the diagnosis and gives them an additional angle to deal with some of her complaints. So Dr. Mandel can make a comment like that, that he can completely disregard her subjective complaints of pain because there's no objective verification for it. And in addition, she's got the MRI of the shoulder, which not only shows a probable labral tear, which can be extremely painful, but this ongoing chronic supraspinatus tendonitis that she has, the major tendon between your neck and your shoulder, is also evident on that same MRI. And yet we're talking about objective evidence. Dr. Mandel examined your client? Yes, he did. He did just look at the record? That's correct. Yeah, he was one of the first to, I believe. Correct. Okay. And then what about the file reviewers? I mean, they do this joint report that just says she's not disabled, right? What's your criticism of that? Over-compartmentalization, easy for me to say, of her conditions. It's very easy, and I see this all the time in my cases, to send it out to a specialist who just looks at it from their standpoint and says, nope, nope, within these four corners of my review, this person would not be disabled, and the next to the next, and there's never a coordination between the experts, and that's what needs to happen, and that's what often does happen. As a matter of fact, I would submit that's the unique thing about this case, is that there's really no effort to look at the total person and determine whether she's disabled, especially in light of the fact that this is during the own occupation period. And especially in light of the fact, as Counsel for Liberty just told this panel, they found it very curious that these records were coming in, and they were confused by them and didn't understand because, you know, she's not disabled from this standpoint, not disabled from that standpoint. So apparently they were focused on this issue right from the start, and yet they still made no effort to coordinate and get someone who could give an opinion about the overall status of this woman, vocational rehabilitation experts, things of that nature, if their pain management doctor wasn't qualified to do it. Okay. That's a clear answer. Thank you. Appreciate your argument. Here, Roboto. Very quickly, just to pick up with that last point, Your Honor, contrary to what Mr. Haney just said, the experts did talk to each other. In the first peer review set of reports, it was one report signed by both a pain specialist and a psychiatrist. The second round of peer reviews, each of the respective reports, Dr. Lobel specifically said in his report, I talked to Dr. Dayland about the psychiatric issues, and she doesn't think there's disability because of the psychiatric issues. But is there anything in their reports that show they're not taking this compartmentalized view of her disabilities and instead are stepping back and saying, in light of everything she's dealing with, is she disabled? So maybe she's 75% of the way there in the first category and 75% in the other. And they could talk to each other and say, yeah, she's not there on that metric and not there on this one. Do they step back and say, well, wait a minute, when you look at all this, that's when somebody starts to go underwater. I think the problem with this case is that when you talk about comorbid conditions, physical conditions juxtaposed against psychiatric conditions, usually that's not a comorbidity. Comorbidity is somebody has a cardiac condition, and as a result of the oxygen deficiency created by that, they end up having pulmonary conditions. That's where you could see someone saying, well, strictly from a cardiac standpoint, this person's ejection fraction is within normal ranges. But then they talk to the pulmonary specialist and they say, well, because of the oxygen deprivation, the person can't walk very much. That's a comorbid condition. The idea of a mental condition being a comorbid condition that would somehow tip the scales, that to me, I'm not a doctor. I don't have that training. None of these doctors really have that whole realm of global training that Judge Jonker seemed to be looking for. But nevertheless, he said, and I think he was right, standing alone, neither the physical nor the mental is disabling, but the combination renders her disabled. Where does that come from? Well, I mean, some of these folks do say it. There's no law that says you cannot have that comorbidity is limited to one physical condition leading to another as opposed to a physical condition leading to a mental. I mean, there's no law that says that. And, I mean, it does, there is, I mean, that does make sense, doesn't it? I mean, if you are suffering terrible pain and you cannot do 20 different important life activities that you did before then, I mean, isn't it sort of understandable somebody might be depressed? Yes, but if someone is depressed enough that they can't work, usually you're going to see them loaded up on medications that's going to have an influence on their physical condition. And yet all the reviewing physicians said the medications weren't adversely affecting her, and there's nothing in the treating records that suggests that medications were. And the same thing with medications used to treat pain. You load somebody up with heavy doses of oxycodone, they're not going to be able to come into work. But that doesn't seem to be at work here. It's just kind of out of the air. The combination renders her disabled. That assumes the patient is going to be willing to take that medication, too. They may make a decision not to take either. But it doesn't even seem to have been prescribed here in this case. But the point here is that, and I think the most critical, and I was thinking about my... Why don't you finish on your most critical point? In answer to the question that I concluded with on my direct was, where do I think Judge Jonker made his biggest mistake? He didn't really even talk about the neuropsychological evaluation results. He mentioned them in the beginning part of his opinion. When you read that report, that, to me, seems like a critical piece of objective evidence that was not given, not only was it given the proper weight, but it wasn't even given any weight, it seems, by the district court. Thank you both for your very helpful arguments. The case will be submitted. The clerk may call the next case.